# IN THE
# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
# ROCK ISLAND DIVISION

| | |
|---|---|
| John C.,<br>    Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br>    Defendant. | Case No. 4:19-cv-04111-SLD-JEH |

## Report and Recommendation

Now before the Court is the Plaintiff's Motion for Summary Judgment (Doc. 13), the Commissioner's Motion for Summary Affirmance (Doc. 17), and the Plaintiff's Reply (Doc. 19). This matter has been referred for a Report and Recommendation. The Motions are fully briefed, and for the reasons stated herein, the Court recommends the Plaintiff's Motion for Summary Judgment be granted, the Defendant's Motion for Summary Affirmance be denied, and the matter be remanded.[1]

## I

Plaintiff John C. filed a Title II application for disability insurance benefits (DIB) on June 17, 2016, alleging disability beginning on December 23, 2014. His claim was denied initially on August 17, 2016 and upon reconsideration on October 27, 2016. John filed a request for hearing concerning his DIB application which was held on January 23, 2018 before the Honorable Robert V. Luetkenhaus (ALJ). At that hearing, John was represented by a non-attorney representative and

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears at (Doc. 9) on the docket.

a vocational expert (VE) testified. During the hearing, John amended his alleged onset date to June 17, 2016, the date John filed his DIB claim. Following the hearing, John's DIB claim was denied on May 14, 2018. His request for review by the Appeals Council was denied on March 4, 2019, making the ALJ's Decision the final decision of the Commissioner. After the Appeals Council extended the time within which he could file a civil action, John timely filed the instant civil action seeking review of the ALJ's Decision on June 3, 2019.

## II

John claimed the following conditions limited his ability to work: quintuple bypass surgery in 2007 and high blood pressure. AR 195. At the January 2018 hearing, John was 60 years old and lived in a house with his wife. He originally stopped working in December 2014. He last worked as recently as 2017 when he returned to his previous employer in April of that year.

John testified that he told his previous employer when they offered him to return to work in 2017 at his previous wage that he did not know if he could still do the job, but would try to do so and if he could not would let the employer know. He recalled he worked from April 2017 for "seven, eight, maybe nine weeks" for 40 hours each week with some overtime "once in a while." AR 48-49. He initially indicated to the ALJ that the term for which his previous employer needed him had come to an end when he stopped working about June 15, 2017. John elaborated that he would have attempted to stay on had the employer needed to extend the time, "but I think once the hot weather really set in, I think it would've been very difficult." AR 50. The room in which he worked, in July, could get up to 100 degrees. He said, the "heat gets to me now. I can't do it like I used to previously." *Id.* The ALJ pressed:

> Q.   Okay, so you really didn't stop because your medical condition prevented you, or some medical condition prevented you from

>   working. It stopped really because the employer didn't really have more work for you at the time.
> A.  It was temporary, correct.

*Id.* John immediately then again testified that he did not know how long he could have continued as it depended upon the heat inside the facility at which he worked. After the weather cooled down, John returned to that work in the fall at which time he worked another seven or eight weeks for 40 hours a week.

John detailed the tasks of the one job he did since 1998. In 2007, following his quintuple bypass, John returned to work 12 weeks later and worked another seven or eight years. As for his return to work in 2017, John said he cut corners and he went to bed every night in "excruciating" pain. AR 58. Upon questioning by his attorney, John more specifically detailed his previous job tasks and confirmed he went back to work in 2017 because he had bills to pay and took shortcuts in the performance of tasks. He went into the air-conditioned breakroom to "recover a little bit." AR 75. John testified that, at the time of the hearing, he had difficulty with his hands as they ached, his joints swelled in the summertime, and his medication caused dizziness. Though he talked to his doctor about his aches and pains, no X-ray or MRI was done as his doctor told him that basically, he was getting old.

John testified he could probably walk less than a quarter of a mile before he had to get off his feet, had problems sitting for lengths of time because his hips started to bother him, and he did not know how many pounds he could lift and carry at that time. He stated that lifting 40-pound bags during his 2017 return to work caused his back to hurt. He helped with things around the house, he tried to visit his elderly mother, who lived about eight blocks away from him, daily to check on her, and he did yardwork at his house and his mother's house. However, John said his wife helped with their yardwork and his son took care of his mother's

3

yard. John testified to an incident in October 2016 when he was raking at his mother's house, taking breaks over the course of four hours to do so. He laid down in the grass and told his mother he did not feel well. John ultimately went to the emergency room where he was told he was dehydrated.

The ALJ then questioned the VE, asking the VE to base his testimony on the national economy and assuming the VE's testimony was based on his knowledge, education, training, and experience as well as was consistent with the Dictionary of Occupational Titles (DOT) unless the ALJ was told otherwise. The VE identified John's previous work under the DOT title of processor, heavy per the DOT, heavy as described in the records, and medium to heavy per John's testimony. The ALJ asked the VE to consider an individual 57 to 60 years old with 12 grades of education and the same past work as John's with: the ability to do medium work with only frequent use of ramps and stairs; frequent climbing of ladders, ropes, and scaffolds; and frequent stooping, kneeling, and crawling. The individual must further avoid concentrated exposure to extreme cold and heat, "as well as humidity and hazards such as moving machinery and unprotected heights." AR 81. The VE answered the individual would be unable to perform John's past work because of the extreme heat to which John was exposed. The VE identified the following representative "medium physical demand" jobs the individual could perform: machine feeder (16,000 jobs in the national economy); off-bearer (20,000 jobs in the national economy); and order picker (20,000 jobs in the national economy). *Id*. Thereafter, the ALJ again asked the VE to confirm whether his testimony had been in accordance with the DOT, and the VE did so.

### III

In his Decision, at Step Two, the ALJ determined John had the severe impairments of coronary arteriosclerosis, status post quintuple coronary artery bypass graft (CABG), and obesity. AR 18. At Step Three, the ALJ considered

Listing 4.04 (ischemic heart disease) and determined that John's impairments did not meet that listing. The ALJ also stated that while there was no listing specific to the evaluation of obesity, he was required to consider it pursuant to SSR 02-1p.[2] The ALJ determined that John's obesity "reasonably has some impact on functioning, but not to the extent of meeting a listing, and not beyond the [RFC] set forth [later in the Decision]." AR 19. At Step Four, the ALJ made the following residual functional capacity (RFC) finding:

> [T]he claimant has the [RFC] to perform medium work as defined in 20 CFR 404.1567(c) except he can only frequently climb ramps and stairs, frequently climb ladders, ropes and scaffolds, frequently stoop, kneel and crawl. The claimant must avoid concentrated exposure to extreme cold, heat, humidity, and hazards such as moving machinery and unprotected heights.

AR 19.

John's treatment records between February 2015 and December 2017 show that he denied chest pain, palpitations, edema, bloating, shortness of breath, symptoms of claudication[3], sleep disturbance, arm pain, lightheadedness, or heart murmur. In June 2016, John reported no sleep disturbances, dizziness, fatigue, cold or heat intolerance, or joint pain. In May 2016, John's diagnoses included atherosclerotic heart disease of the native coronary artery without angina pectoris, pure hypercholesterolemia, and benign hypertension, and in June 2016 another doctor diagnosed him with hypertension, hyperlipidemia, chronic ischemic heart disease, and a hand wart. At separate six-month follow up appointments in 2017, John denied any problems or concerns. His physical examinations were unremarkable/normal. At the time John sought emergency treatment for sudden

---

[2] SSR 02-1p was rescinded in May 2019.
[3] "Limping or lameness." DORLANDS.COM, https://www.dorlands.com/dorlands/def.jsp?id=100021751 (last visited Oct. 22, 2020).

weakness and dizziness in October 2016 following yard work, he reported he had been doing "all kinds of activity." AR 21 (citing Exhibit 5F/39). A transthoracic echocardiogram was normal and John's physical examination was normal. The doctor indicated his symptoms were likely secondary to dehydration; John received fluids and felt better. Specifically with regard to the medical evidence of record, the ALJ observed John's treatment since the alleged onset date had been "relatively limited, and quite benign," his more recent treatment providers found him to be clinically stable, he reported doing well and denied cardiac symptoms, and he "also denied many of the other symptoms of which he now complains[.]" AR 21.

The ALJ next detailed the evidence of John's activities including yard work, return to full-time employment beginning in April 2017 and again through September and October 2017, and his daily activities around the home. Finally, the ALJ considered the State Agency doctors' August 2016 and October 2016 opinions in which they found John capable of working at the medium exertional level limited to frequent climbing of ramps and stairs, stooping, kneeling, and crawling and occasional climbing of ladders, ropes, and scaffolds, and that he must avoid concentrated exposure to extreme heat and cold, humidity, and hazards. Those opinions were given "significant weight." AR 22.

## IV

John argues: the ALJ erred in evaluating his subjective symptoms and considering impairments in combination; and the ALJ's Step Five determination is not supported by substantial evidence.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if

supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. *See* 20 C.F.R. § 404.1566. The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. § 404.1520. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2)     suffers from an impairment that is severe and meets a durational requirement, or suffers from a combination of impairments that is severe and meets the durational requirement;

3)     suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4)     is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

5)     is unable to perform any other work existing in significant numbers in the national economy.

*Id*. An affirmative answer at steps 3 or 5 leads to a finding that the plaintiff is disabled. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. *Id*. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

In the instant case, John claims error on the ALJ's part at Steps Four and Five.

## A

John first argues that the ALJ erred in evaluating his subjective symptoms, taking issue with the ALJ's consideration of his daily activities and his testimony regarding his return to work in 2017. The Commissioner argues the ALJ reasonably evaluated John's subjective symptoms where the ALJ considered his treatment records from medical sources, John's hearing testimony regarding his return to work, the medical source opinions of record, and the ALJ's consideration of his daily activities. 20 C.F.R. § 404.1529(c) provides that in evaluating the

8

intensity and persistence of a claimant's symptoms and determining the extent to which the claimant's symptoms limit his capacity to work, the ALJ is to consider "all the available evidence from [the claimant's] medical sources and nonmedical sources," including medical opinions, objective medical evidence, and other evidence relevant to the claimant's symptoms. 20 C.F.R. § 404.1529(c)(1)-(4).

Here, the ALJ discussed John's medical records which confirmed his history of CABG and arteriosclerosis and which showed that between February 2015 and December 2017, John's physical examinations were unremarkable, he was clinically stable, and he had "stable cardiac status." AR 20-21. Those medical records included John's reports that his activity tolerance was stable, he was staying very active, he engaged in moderate exercise and he had no exercise intolerance, he had no dizziness or fatigue, he had no shortness of breath when walking or lying down, he had no palpitations or ankle edema, and he had no muscle aches or weakness. The ALJ also confronted the evidence of John's emergency room visit for sudden weakness and dizziness in October 2016 after he had been doing yardwork for about four hours.

As for John's own statements, the ALJ considered John's testimony that when he returned to work in 2017, he lifted and carried large pipes weighing up to forty or fifty pounds, and he loaded three to four pallets a day with forty bags per pallet, each bag weighing thirty to fifty pounds. The ALJ noted that John testified he was in excruciating pain by the time he went to bed at night during the time he had returned to work in 2017. John testified to aches in cold temperatures and swollen joints in the heat, and he testified he was able to take breaks in an air-conditioned room during his return to work. The ALJ detailed John's daily activities which included loading the dishwasher, doing laundry, occasionally vacuuming, taking care of his own and his mother's yard, and driving alone.

The ALJ did not commit error in his consideration of John's subjective statements. Insofar as John faults the ALJ for failing to acknowledge the differences between the demands of household chores and those of a full-time job, the ALJ was expressly permitted by Section 404.1529(c)(3)(i) to consider those daily activities. *See also* SSR 16-3p (detailing the two-step process for evaluating an individual's symptoms which includes the consideration of factors such as daily activities and factors that precipitate and aggravate symptoms). Moreover, reading the ALJ's Decision as a whole, the ALJ clearly did not place an undue emphasis upon those activities (performed with certain limitations, as John points out). *See Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008) (stating that an ALJ can "appropriately consider a claimant's daily activities when assessing his alleged symptoms" but noting the Social Security Administration has been cautioned against placing an "undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home"). That the ALJ did not merely equate John's ability to do household chores with the ability to do full-time work is made clear by the ALJ's consideration of those daily activities alongside the medical evidence of record and evidence of his return to work in 2017. As detailed above, John did not complain of exercise intolerance, his physical examinations were unremarkable, he managed to briefly return to his previous work in 2017, albeit with pain and sensitivity to heat, and his ER visit in October 2016 was precipitated by several hours of yard work. Because the ALJ made no error in his consideration of John's subjective statements and record medical evidence, the ALJ did not err by giving "significant weight" to the State Agency doctors' opinions as "consistent with the evidence of record." AR 22.

The Court can trace the path of the ALJ's reasoning between medical evidence of John's severe heart impairments, his performance of daily activities and previous work (completed with breaks and accompanied by temperature

10

sensitivity and pain), the medical opinions of record and the RFC finding that limited John to medium work with postural limitations as well as environmental limitations. *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (stating that an ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning"). As for the remaining RFC limitation that John avoid hazards such as moving machinery and unprotected heights, the ALJ again sufficiently connected the dots where he included John's statements that his medications caused him side effects, including dizziness, and later explained, "[John's] medication side effects require that he also avoid concentrated exposure to hazards such as moving machinery and unprotected heights." AR 22.

B

As for John's obesity, he argues that the ALJ in error did not address how it interacted with his other impairments and appears to fault the ALJ in the latter's consideration of a doctor's note that John exercise and lose weight. The Commissioner counters that the ALJ did not disregard John's obesity when the ALJ evaluated John's work-related limitations, and John puts words in the ALJ's Decision that are not there to the extent he argues the ALJ improperly found he failed to follow prescribed treatment (exercise and diet).

John's attack on the ALJ's consideration of his obesity is unwarranted. At Step Three, the ALJ explained that SSR 02-1p required him to consider obesity in determining whether John had medically determinable impairments that were severe, whether those impairments met or equaled any listing, and finally in determining the RFC. AR 19. The ALJ further acknowledged that "[o]besity may have an adverse impact upon co-existing impairments, such as cardiovascular, respiratory and musculoskeletal symptoms." *Id.* The ALJ explained he took that into consideration at the relevant steps of the sequential disability evaluation

process, and determined that, at Step Three, the medical evidence of record did not indicate John's obesity contributed to any other severe impairments such that it would cause the impairment to meet any listing. Later, the ALJ expressly stated, "the undersigned has considered the effects of the claimant's obesity on his [RFC] pursuant to SSR 02-1p." AR 21. The ALJ noted John's height, weight, and body mass index (BMI), and he discussed medical records noting John's BMI of up to 35.9 and a physician's recommendation he lose weight and encouragement that he exercise. *Id.* The ALJ again articulated that the evidence related to John's obesity did not support his alleged functional deficits "nor does the record support a finding that the cumulative effects of obesity would make any of the claimant's other conditions totally disabling." *Id.* To the extent the ALJ specifically referenced SSR 02-1p and incorporated limitations on climbing ramps and stairs and stooping in the RFC, the ALJ's consideration of John's obesity was adequate. *See Shumaker v. Colvin*, 632 F. App'x 861, 867 (7th Cir. 2015) (unpublished opinion) (finding the ALJ adequately accounted for the claimant's obesity where the ALJ considered it, analyzed the effect of it on her RFC by referencing SSR 02-1p, and incorporated several of the limitations described in SSR 02-1p into the RFC).

The ALJ's discussion of a doctor's recommendation that John exercise and lose weight reveals – read in the context of paragraph of the Decision in which it appears – he did nothing more than acknowledge the fact of John's obesity and that it was something a doctor indicated should be addressed. The ALJ was not, as John suggests, playing doctor or using that recommendation to say John was not limited in any way by pain. Lastly, John does not identify any evidence in the record that suggests greater limitations from his obesity that the ALJ should have included. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (finding it notable that the claimant did not specify how his obesity further impaired his ability to

12

work and instead "merely" speculated that his weight made it more difficult to stand and walk).

## C

While the Court finds that the ALJ committed no legal error in his consideration of the record evidence and supported his RFC assessment with substantial evidence, the Court finds the Commissioner did not meet his burden at Step Five of the sequential evaluation process. John argues that pursuant to SSR 00-4p, the ALJ had an affirmative obligation to investigate the obvious conflict between the DOT and the VE's testimony as to the jobs the hypothetical individual with John's RFC could perform. John says there was an obvious conflict between the RFC which precluded exposure to "hazards such as moving machinery" and the jobs of machine feeder and off-bearer. He says there was also an obvious conflict between the RFC which provided the individual must avoid concentrated exposure to extreme cold, heat, and humidity and the job of order picker. The Commissioner argues that the VE's unchallenged testimony combined with the DOT job descriptions contradicts John's argument that there was an "obvious" conflict for the ALJ to resolve as the DOT descriptions for the jobs of machine feeder and off-bearer showed that work around moving machinery is not a necessary element of any of the jobs.

SSR 00-4p provides, in relevant part:

Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

SSR 00-4p, at *2. The Seventh Circuit has "repeatedly noted that if a vocational expert's testimony appears to conflict with the DOT, the ALJ must obtain a reasonable explanation for the apparent conflict, and that a claimant's failure to object during a hearing cannot excuse an ALJ's failure to do so." *Brown v. Colvin*, 845 F.3d 247, 254-55 (7th Cir. 2016) (internal quotations omitted). "A conflict is apparent if it is 'so obvious that the ALJ should have picked up on [it] without any assistance.'" *Weatherbee*, 649 F.3d at 570 (quoting *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008)). Here, the VE testified that a hypothetical individual with John's RFC would be able to perform the jobs of machine feeder, DOT code 699.686-010, off-bearer, DOT code 921.686-014, and order picker, DOT code 922.687-058.

> The DOT code 699.686-010, entitled "machine feeder," provides, in part:
>
> Feeds or removes metal, plastic, or other stock and material from automatic fabricating machines: Places stock into hoppers, onto conveyors of self-centering machine bed, or lifts coils of sheet metal or wire onto feedrack. Removes stock from conveyor and piles it into boxes, truck, or on feed conveyor for next operation.

DICTIONARY OF OCCUPATIONAL TITLES, www.dol.gov/agencies/oalj/PUBLIC/DOT/REFERENCES/DOT06F. The job of machine feeder "may" involve other actions such as pushing dual control buttons to activate a machine, threading sheet metal or wire through a machine, and working in pairs to free or remove pieces from the machine. *Id.* Beyond the fact that "machine" is in the title of the job, as John points out, the DOT description is replete with references to the use of machines and conveyors. The conflict is obvious and so the ALJ was required to obtain a reasonable explanation for the conflict. Similarly, the conflict is obvious between the DOT code 921.686-014 and the VE's testimony that such a job would be available to an

14

individual with John's RFC.  The DOT code 921.686-014, entitled "conveyor feeder-offbearer" provides, in part:

> Feeds and off bears conveyor or conveyor system performing any of following tasks: Picks up materials or products from pallet, handtruck, or dolly, and places materials or products onto conveyor, or opens bins or chutes to dump bulk materials onto conveyor, or hangs products on chain or overhead conveyor, or transfers materials or products from one conveyor to another conveyor, and aligns materials or products on conveyor to prevent jams. Dislodges jams by hand or pole. Removes materials or products from discharge end of conveyor and stacks materials or products on trays, pallets, or handtrucks.

DICTIONARY OF OCCUPATIONAL TITLES, www.dol.gov/agencies/oalj/PUBLIC/DOT/REFERENCES/DOT09B.  Such a job "may" include, among other things, the inspection of materials or products for damage for conformity to specifications and stenciling, tagging, stamping, or writing identifying information on packaged products.  Again, the very title of the job includes "conveyor" and the description continually refers to a conveyor.

The Commissioner says SSR 00-4p states that "[n]either the DOT nor the [VE's] evidence automatically 'trumps' when there is a conflict."  SSR 00-4p at *2.  SSR 00-4p goes on to explain that the "adjudicator must resolve the conflict by determining if the explanation given by the [VE] is reasonable and provides a basis for relying on the [VE] rather than on the DOT information."  *Id*.  "Reasonable explanations for such conflicts, which may provide a basis for relying on the evidence from the [VE], rather than the DOT information, include, but are not limited to" information about a particular job's requirements appearing in other reliable publications, information obtained directly from employers, or from a [VE's] experience in job placement or career counseling."  *Id*.

15

Here, before the VE was even provided with the hypothetical individual, he confirmed the ALJ's stated assumption that the VE's testimony was based upon his knowledge, education, training, and experience and was consistent with the DOT unless he told the ALJ otherwise. The Court does not find that such a confirmation amounted to a "reasonable explanation" for the conflict between the VE's testimony and the DOT. Indeed, after the VE was presented with the hypothetical and identified the jobs of machine feeder and off-bearer, the ALJ only asked if the VE's testimony was in accordance with the DOT to which the VE responded, "Yes, your honor." AR 82.

John argues there was an obvious conflict with the third and final job of order picker the VE identified as well. The DOT code 922.687-058, entitled "laborer, stores" provides, in part, "Performs any combination of following tasks to receive, store, and distribute material, tools, equipment, and products within establishments[.]" DICTIONARY OF OCCUPATIONAL TITLES, www.dol.gov/agencies/oalj/PUBLIC/DOT/REFERENCES/DOT09B. The job description is quite lengthy, but John highlights just the following: "Conveys materials and items from receiving or production areas to storage or to other designated areas by hand, handtruck, or electric handtruck . . . Sorts and stores perishable goods in refrigerated rooms." *Id*. John argues those descriptions raise the question of whether the individual would be exposed to extreme temperatures and whether the individual would be outside in the winter or summer months as he would need to stand in the receiving area. The VE was asked to consider an individual that must "avoid *concentrated* exposure to extreme cold and heat." AR 81. As nothing within the description for order picker specified the extent of time to be spent in refrigerated rooms sorts and storing perishable goods or the extent of time to be spent in receiving areas, there was no conflict between the VE's

testimony and the order picker DOT description so obvious that the ALJ should have picked up on it without any assistance.

However, the ALJ's failure to resolve the conflict between the VE's testimony and the DOT is *not* rendered harmless by the fact that the job of order picker remains. *Compare Coleman v. Astrue*, 269 F. App'x 596, 602 (7th Cir. 2008) (unpublished opinion) ("The ALJ's failure to comply with SSR 00–4p was therefore harmless as, at the very least, a significant number of jobs cited by the ALJ and not inconsistent with the DOT remained available to [the claimant]"). The VE testified that there were "[a]pproximately" 20,000 order picker jobs available in the national economy. AR 81. John cites *Sally S. v. Berryhill*, wherein the Northern District of Indiana court determined that the 120,350 jobs testified to in that cases did not amount to a significant number of jobs the claimant could perform in the national economy as required at Step Five. No. 18cv460, 2019 WL 3335033, at *11 (N.D. Ind. July 23, 2019). The Commissioner does not say one way or the other as to whether 20,000 jobs amounts to work existing in significant numbers in the national economy in satisfaction of his burden at Step Five; he argues only that the ALJ reasonably relied on the VE's testimony in this case as there was no obvious conflict between it and the DOT. Thus, any such argument is now waived. *Delapaz v. Richardson*, 634 F.3d 895, 900 (7th Cir. 2011).

The Seventh Circuit Court of Appeals appears to have only ever determined the local/regional numbers that amounted to "significant" numbers of jobs for purposes of the Commissioner's Step Five burden. The undersigned found just one district court case within this Circuit which determined that a number below 20,000 amounted to a significant number of jobs in the national economy. *See Dorothy B. v. Berryhill*, No. 18 CV 50017, 2019 WL 2325998, at *7 (N.D. Ill. May 31, 2019) (17,700 jobs "a significant number of jobs in the national economy"); *but see James A. v. Saul*, No. 19-CV-180, 2020 WL 3888155, at *3 (N.D. Ind. July 10, 2020)

17

("The Court concludes that, as a matter of law, 14,500 jobs, or approximately 1 out of every 10,000 jobs, in the national economy is not a significant number of jobs"). Job numbers *in excess* of 20,000 in the national economy have been found to constitute "significant" at Step Five in more than just one other case within this Circuit. *See Iversen v. Berryhill*, No. 16 CV 7337, 2017 WL 1848478, at *5 (N.D. Ill. May 8, 2017) (finding the job of waxer for which 1,000 waxer positions existed in Illinois and 30,000 existed in the nation a job that alone sufficed to support the ALJ's Step Five determination); *and Joseph M. v. Saul*, No. 18 C 5182, 2019 WL 6918281, at *17 (N.D. Ill. Dec. 19, 2019) (finding that positions which accounted for 40,000 jobs nationally were enough to support the ALJ's alternative Step Five findings). To roughly illustrate the lack of "significant numbers" in the national economy, the Court notes that 20,000 jobs divided by 50 states amounts to just 400 jobs per state. Without controlling authority saying otherwise, the Court finds that 20,000 jobs in the national economy do not amount to work existing in significant numbers in the national economy. As the Commissioner failed to sustain his burden at Step Five, the undersigned recommends this case be remanded for the ALJ to elicit conflict-free testimony from the VE or, if an apparent conflict is presented, to further question the VE to obtain a reasonable explanation for the apparent conflict.

## V

For the reasons set forth above, it is recommended that: 1) the Plaintiff's Motion for Summary Judgment (Doc. 13) be granted; 2) the Defendant's Motion for Summary Affirmance (Doc. 17) be denied; and 3) this case be remanded to the Commissioner of Social Security for further proceedings consistent with this Opinion Pursuant to 42 U.S.C. §405(g), Sentence Four.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) days

after service of this Report and Recommendation. FED. R. CIV. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended*.

Entered on October 26, 2020.

s/Jonathan E. Hawley<br>U.S. MAGISTRATE JUDGE